**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION**

**MATTHEW P. WALLACE**                                                            **PLAINTIFF**


**VERSUS**                                                            **CAUSE NO.: 3:16CV287-M-P**


**DESOTO COUNTY SCHOOL DISTRICT,
and DAN TURNAGE**                                                            **DEFENDANTS**


**ORDER**

This cause comes before the court on the motion of defendant Desoto County School

District, pursuant to Fed. R. Civ. P. 56, for summary judgment.  Plaintiff Matthew Wallace has

responded in opposition to the motion, and the court, having considered the memoranda and

submissions of the parties, concludes that the motion should be granted in part and denied in

part.

This is, *inter alia*, a wrongful termination case arising out of Wallace's August 2016

firing as head football coach, athletic director and school teacher at Desoto Central High School.

In removing plaintiff from his teaching responsibilities on August 15, the school district cited

"immoral conduct" on his part, which evidently referred to the fact that a photograph depicting

him in a state of nudity had appeared on the Ashley Madison dating website.  Shortly before his

termination, plaintiff had filed a complaint of sexual harassment with the school district against

his ex-wife Tanya Keck, likewise a school district employee, alleging that she had conspired

with her friend and co-worker Dan Turnage to post the nude photo of him on Wallace's Ashley

Madison account in order to harass him and damage his career.

1

For its part, the school district concluded that the mere fact that the nude photo of plaintiff had appeared on a dating website associated with adultery justified his termination, regardless of how it came to be there. Shortly after his firing, plaintiff filed a charge of discrimination with the EEOC, and he later filed the instant action in this court, alleging, *inter alia*, that he was fired based on sex discrimination and in retaliation for opposing sexual harassment by his ex-wife. The school district has now filed a motion for summary judgment, arguing that it has no potential liability for any of plaintiff's claims and that it is entitled to judgment as a matter of law.

**DISCUSSION**

Before discussing the various federal and state claims asserted by plaintiff, this court will first make some observations regarding the facts of this case, since they are relevant to many of the claims discussed below. As noted previously, this is a case in which Wallace, then the head football coach at Desoto Central High School, was fired soon after it became publicly known that photos depicting him in a state of full frontal nudity had appeared on his Ashley Madison account. Ashley Madison is a dating website whose motto is "life is short, have an affair," and plaintiff concedes that he voluntarily signed up for that site during the last year of his marriage to Tanya Keck, in 2015. Plaintiff also concedes that he actually had an affair with Samantha Rivera, who, like plaintiff and Keck, was a Desoto County School District employee. It seems clear that this affair with Rivera was a prime factor in the failure of plaintiff's marriage, and it appears that Keck harbored considerable animus towards both plaintiff and Rivera as a result.

The fact that a high school football coach was terminated under the above circumstances would not, to say the least, ordinarily give rise to a valid federal lawsuit. Indeed, this court believes that a jury may well have considerable sympathy for the school district's position that it

would rather not have a head football coach who was publicly associated with nude photographs on his Ashley Madison account (regardless of how they came to be there), and it may well look with skepticism upon plaintiff's claims that such factors as sex and retaliation were the real reasons for his firing.

At this stage of the proceedings, however, this court is required to view the facts in the light most favorable to plaintiff, as the non-moving party, and he is able to point to a number of potentially favorable facts in this case. Perhaps more importantly, plaintiff is able to point to a number of questionable decisions made by the school district in handling his termination, which serve to greatly assist him in establishing his federal claims. The first of the arguable errors made by the school district is that it granted plaintiff no public hearing, which he requested, in which he could have given his side of the story and sought to keep his job. While it is unclear whether such a hearing would have saved plaintiff's job, it seems highly likely that it would have at least mitigated the very considerable damage which he suffered to his reputation.

If plaintiff had been granted such a public hearing, then he almost certainly would have presented proof that he did not post the nude photo of himself on his Ashley Madison account, as at least some press accounts (discussed below) indicated was the case. In his summary judgment brief, plaintiff has presented very substantial, bordering on overwhelming, proof that the nude photograph of him was posted by either his ex-wife Keck, her friend (and fellow Desoto County school district employee) Don Turnage,[1]

_____

[1]Plaintiff refers to Turnage as Keck's "boyfriend," but the exact nature of their relationship does not appear to be of great importance in this case.

or both of them working together. Indeed, Keck conceded in her deposition that she took the nude photo of Wallace during their marriage, and she likewise conceded that she knew the password to his Ashley Madison account. She nevertheless denied having posted the photo herself, and she expressed her opinion that Turnage had done so, after obtaining the password from her cell phone.

A jury may well look with suspicion upon Keck's claims of innocence in this regard, since, as noted in plaintiff's brief:

> However, in discovery, Keck provided a text message that showed that Keck provided Turnage the name of Wallace's Ashley Madison account, and his password. When asked whether she had sent the text message to Turnage, Keck responded, "Not that I recall." In a later text message from Turnage to Keck it says "That sign in and password that u had. Are u not worried that they can trace that? I know I did it one time. Wouldn't look good huh."

[Plaintiff's brief at 7]. Keck was initially named as a defendant in this case, but she has since settled the claims against her, and Turnage and the school district are the sole remaining defendants.[2] There is a great deal of other proof in the record, discussed in plaintiff's brief, that Turnage and/or Keck posted the photo in question, and it seems quite likely that plaintiff could have reduced the damage to his reputation if he had been given an opportunity to present that proof at a hearing.

To be sure, plaintiff admits that he did sign up for the Ashley Madison account himself, but he emphasizes that this fact became publicly known in August 2015, when the worldwide release of the site's database by "hackers" took place. Plaintiff notes that his career (and that of

---

[2]The present motion for summary judgment was filed by the school district alone, and it is thus apparent that a trial will be held in this case as to Turnage regardless of the disposition of this particular motion. As to Turnage, plaintiff asserts claims of malicious interference with employment relations and invasion of privacy.

a co-worker similarly implicated) had weathered the storm of the release of the site's database, and a jury may well find that it was the posting of his nude photo on the website in August of 2016 which led to his termination. A jury might reasonably also find that plaintiff was the victim, rather than the instigator, of this posting, and that he did nothing more than allow his then-wife Keck to take a nude photograph of him while they were married.

It seems clear that this might have greatly mitigated the damage to plaintiff's reputation, and a jury might potentially find that it would have saved his job. Indeed, in his deposition, the school district's superintendent Corey Uselton testified that he received pressure from Mississippi state senator Jeff Hale to fire plaintiff after the nude photo became public. Specifically, Uselton testified that:

> [Hale] called me wanting to know what we were going to do about the football coach at Desoto Central High School. He said constituents were calling him, wanting him to -- you know, wanting to know what was going to be done because he didn't need to continue to be working there.

[Uselton depo. at 55]. In his deposition, however, plaintiff testified that he personally spoke with Senator Hale and that, after making clear that he was not the one who posted the photo online, Hale no longer wanted him fired. Hale is listed as a "may call" witness by plaintiff in the pretrial order, and it strikes this court that, if he supports plaintiff's version of events at trial, then his testimony may well help establish that a hearing would likely have saved his job.

That brings this court to what is arguably another unforced error by the school district in this case, which relates to the manner in which it handled a very similar situation involving the release of another nude photo of a female employee around this same time. It appears that this was no coincidence, since that co-worker was none other than plaintiff's girlfriend Rivera, who testified that Turnage and/or Keck had unlawfully obtained and disseminated a "partially" nude photograph of her backside which she had sent to plaintiff and which he kept on his smartphone.

Significantly, Turnage admitted to the school district that he e-mailed the photo of Rivera to co-workers around the same time as the photo of plaintiff was released, and Rivera, like plaintiff, complained to the school district about the "sexual harassment" which she suffered at the hands of Turnage.

Thus, the school district was presented with two very similar reports of sexual harassment involving a male and a female employee, but it could not have handled them more differently. Indeed, plaintiff notes that not only was Rivera not fired, but the school district took her complaint against Turnage seriously, found it meritorious, and ordered him to stay away from her. This contrasts very sharply with the district's decision to fire plaintiff without a public hearing. As discussed below, this disparity greatly assists plaintiff in arguing that his sex was at least a motivating factor in his termination and/or that he was terminated for "opposing" acts of sexual harassment by his co-workers Turnage and Keck.

In its defense, the school district emphasizes that Turnage admitted emailing the photo of Rivera to co-workers but that he denied having posted the photograph of plaintiff on his Ashley Madison account. Defendant thus maintains that it investigated both incidents, but a jury may find that, in this context "investigated" simply means asking Turnage and Keck whether they were guilty and accepting their answer at face value. It strikes this court that Turnage had greater plausible deniability with regard to having posted the photograph of plaintiff, since there was a stronger electronic trail connecting him to the photo of Rivera. Regardless, even Keck conceded in her deposition that she did not believe that Wallace had posted the photograph of himself on his Ashley Madison account, and she expressed her view that whoever did so wanted plaintiff to be fired:

> Q: Would it be safe to say whoever uploaded this photo and distributed it wished for Matthew Wallace to be fired from his position?

Keck: That would be a safe assumption.

[Keck deposition at 19].

It seems likely to this court that, if the school district had done a more thorough investigation into these matters, then it could have easily discerned a strong likelihood that Turnage and/or Keck were involved in releasing both photographs. Indeed, even without damaging direct evidence such as the above-quoted text exchange between Keck and Turnage, it would have been an extraordinary coincidence indeed if Turnage had been involved in spreading a photo of Rivera which, she testified, could only have been found by accessing Wallace's personal electronic files, and yet had nothing to do with the nearly simultaneous release of the nude photo of plaintiff. There would certainly appear to have been a motivation for Turnage to release the photo of Wallace, since there is very considerable evidence, discussed in plaintiff's brief, of a history of personal animus on the part of Turnage towards plaintiff.

Of course, the school district maintains that it simply did not want a head football coach who was publicly known to have had nude photographs of himself posted on his Ashley Madison account, regardless of how they came to be there. Once again, this court does not regard this as being an unreasonable position on its face, and it may well carry the day at trial. At the same time, when the school district insists that it conducted an investigation of both Rivera and Wallace's complaints of sexual harassment, and yet that "investigation" appears to have been so perfunctory as to Wallace, then it becomes more difficult for it to argue that there are no jury issues regarding whether plaintiff's sex was at least a motivating factor in his termination. This impression that the school district did not want to hear what plaintiff had to say in his defense is strengthened by its refusal to give him the hearing which it initially promised him in his termination letter. Considered in this light, a jury might conceivably view the school district as

an enabler and facilitator of the actions of its employee(s) Turnage and/or Keck in violating the privacy rights of another employee in order to have him fired.

In the court's view, another factor militating against the school district's motion for summary judgment is the fact that, while it argues that it terminated plaintiff for misconduct going back years, it had offered him a conditional offer of re-employment in March 2016, which was only months before he was fired. This offer was conditional upon plaintiff renewing his teaching certificate, but it was made after the worldwide release of the Ashley Madison database the previous August. Indeed, Desoto County Principal Cliff Johnston admitted in his deposition that "everyone" at the school had known that Wallace's Ashley Madison account was among those exposed by hackers, but that he nevertheless fully intended to re-hire him as teacher:

> Q: Alright, you said he also admitted to being on the Ashley Madison website. You knew that a year before, didn't you?
> Johnston: Uh huh, but I had never asked him about it. * * *
> Q: In fact, everybody knew that he was on the Ashley -
> Johnston: Uh-huh. (Affirmative response). * * *
> Q: So you had every intention of him being a school teacher for you the next school year. Is that correct?
> Johnston: That's correct.

[Johnston depo. at 27].

Clearly, plaintiff will be able to use this testimony to argue that, whatever his moral failings in signing up for an Ashley Madison account while he was married, the school district did not regard it as involving sufficiently "immoral conduct" to justify his termination or even non-renewal as teacher. Indeed, Johnston testified, as quoted above, that he never even asked plaintiff about the incident. Moreover, Johnston confirmed in his deposition that the release of the nude photograph of plaintiff was the only "new" negative event which had occurred in relation to Wallace's career, since he had been conditionally offered re-employment months previously:

Q: Wouldn't you agree that the only new thing that you've got listed there about what you're talking to him about is the nude picture?
Johnston: Yes, sir.  That was the only new thing.

[Johnston depo. at 41].

In discussing some of the favorable facts which plaintiff is able to present on his own behalf, this court by no means seeks to cast him as an innocent victim in this case.  Clearly, there would have been no nude photograph of plaintiff posted on his Ashley Madison account if he had not signed up for the website and allowed Keck to photograph him nude during their marriage.[3]  At the same time, the overriding fact is that, at this stage of the proceedings, this court is required to view the facts in the light most favorable to plaintiff, as the non-moving party.  So considering the facts, it becomes clear that plaintiff does have a story to tell the jury which might at least potentially support some of the claims which he asserts in this case.  Having given its impression of the facts of this case, this court will now turn to the school district's motion to dismiss the specific claims asserted by plaintiff in this case.

**Procedural Due Process and associated state law claims**

---

[3]In so stating, this court is not passing judgment regarding the morality, or even good taste, of a married couple taking such a photograph, although it may certainly be regarded as unwise. Indeed, in this day and age, there is a long list of folks who regret having allowed a former significant other to take a nude photograph or video of them.  Further, the court cannot overlook the fact that the actors in this situation drama spent so much time indulging their modeling, photography, and voyeuristic interests, that one marvels that these players had any time left over to inspire the hearts and minds of the young people entrusted to their tutelage.

This court first considers the school district's motion to dismiss plaintiff's claim that defendant's failure to afford him the hearing he requested resulted in a violation of state law and his Fourteenth Amendment due process rights. This court will consider plaintiff's federal claim first, although it is, to a large extent, intertwined with his rights under Mississippi law. In arguing that he was unconstitutionally deprived of a hearing to clear his name, plaintiff relies upon arguments that he was deprived of both "property" and "liberty" interests which he enjoyed under the procedural due process clause of the 14th amendment.[4] The Supreme Court has held that "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L. Ed. 2d 18 (1976) (quotation marks and citation omitted). "The right to be heard does not depend upon an advance showing that one will surely prevail at the hearing." *Fuentes v. Shevin*, 92 S.Ct. 1983, 1997, 407 U.S. 67, 87 (1972).

After considering the parties' briefing, this court concludes that defendants have the better arguments on the issue of whether plaintiff had a "property" interest in his job at the time he was fired, but it concludes that plaintiff has made a persuasive case that the unique circumstances of this case implicated his "liberty" interest in maintaining his professional reputation so as to allow him the freedom to practice his chosen profession of football coach and teacher. This court will consider these two theories in turn.

**Property interest claim and associated Mississippi statutes**

With regard to plaintiff's property interest claim, the Supreme Court has noted that:

To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of

---

[4]That is, the procedural due process clause of the Fifth Amendment, as incorporated by the Fourteenth Amendment and made applicable to the states.

> it. He must, indeed, have a legitimate claim of entitlement to it . . . Property
> interests, of course, are not created by the Constitution. Rather, they are created
> and their dimensions are defined by existing rules or understandings that stem
> from an independent source such as state law—rules or understandings that secure
> certain benefits and that support claims of entitlement to those benefits.

*Bd. of Regents v. Roth*, 408 U.S. 564, 578 (1972).

In the court's view, plaintiff's argument that he had a "property" interest in his job at the time he was fired is defeated by the fact that, unfortunately for him, his state teaching certification had briefly lapsed at the time he was fired. In his brief, plaintiff does not appear to actually dispute that this is the case, but he argues that he had taken all requisite steps to have a new teaching license issued, most notably by taking the required certification test. Plaintiff argues that it was incumbent upon the school district to take the final step of contacting the Mississippi Department of Education ("MDE") to have his teaching certificate issued, and he contends that defendant dropped the ball in this context.

Plaintiff's assertion is in conflict with the terms of the school district's employee handbook, which places the onus upon teachers to maintain their certification. Defendant has submitted a copy of its handbook, signed by plaintiff, which clearly informed him that "all licensed employees must renew their license by meeting specific requirements of the Mississippi Department of Education" and that "[l]icense renewal is a personal responsibility." [Handbook at 10]. The handbook also advised plaintiff that "at will employees are not entitled to a discipline hearing" and that "[a]n at-will employee is any employee who does not receive a contract of employment." Once again, plaintiff was given a *conditional* contract of employment in March 2016, and a condition precedent for that contract becoming valid was his obtaining a teaching certification.

In explaining his failure to take the certification test earlier than he did, plaintiff states that he "was not able to apply for the test until the end of May 2016, because he had to have total hip replacement surgery and needed time to recuperate." [Plaintiff's brief at 15, footnote 13]. While these circumstances do help explain why plaintiff sought certification at such a late date, the school district is certainly not at fault for his medical issues. Moreover, Wallace's conditional contract offer dated March 31, 2016, made it clear to him that:

> This is to advise you that you will be recommended for re-employment with the Desoto County School District for the 2016-2017 school year contingent upon: renewal of your one year Mississippi Educator's Licence.

[Plaintiff's exhibit 30]. Thus, the school district's conditional offer made it clear that plaintiff would be "recommended" for re-employment upon *renewal of his license*, not upon his merely taking the exam which would allow that renewal to take place. Finally, this court notes that plaintiff concedes that, after he was fired, he himself contacted MDE and that, once he did so, his certificate was issued the same day. [Plaintiff's brief at 17]. Under these circumstances, it is certainly arguable that plaintiff should have personally made sure that his teaching certification was in order as soon as he became aware that his job was in jeopardy.

At the same time, this court acknowledges that certain equitable considerations do appear to support plaintiff's arguments on this issue, and if Fifth Circuit precedent gave it the authority to conduct such an equitable analysis, then it would be more than willing to do so. It does not, however. Fifth Circuit precedent makes clear that, in cases where formal state rules governing entitlement to a job exist, those rules, and not informal understandings, are controlling in determining whether a procedural due process "property" interest exists. *See Watson v. N. Panola Sch. Dist.*, 188 F. App'x 291, 292–93 (5th Cir. 2006).

In the court's view, *Watson* is an illustrative decision in this case, since it makes clear that formal state law requirements are controlling in this context, even if their application may be seen as harsh and inequitable.  The Fifth Circuit described the facts of *Watson* as follows:

> In the spring of 2003, Watson learned that the person who had taken his position as an instructor had resigned. Watson decided that he wanted to return to his previous job; he applied for the position and was granted an interview. During the interview, the high school principal indicated that Watson would get the instructor position. Based on his belief that he was going to be employed by the School District, Watson withdrew from nursing school and reported for work at the school.
>
> Watson worked as an instructor for one week before the school's spring vacation. After the vacation, Watson was informed that a different candidate had been hired to fill the instructor position. The school principal explained to Watson that the school board (the "Board") had made the decision to hire the other candidate. Watson was sent home and asked not to return.

*Watson*, 188 F. App'x at 292–93.

Thus, the teacher in *Watson*, like plaintiff in this case, had been informally promised by the principal that he would be given the position in question, and he detrimentally relied upon this promise and had even started work at the school.  Clearly, these facts bear considerable resemblance to those in this case.  Nevertheless, the Fifth Circuit wrote that:

> Even if we assume, as we must at this point, that the school principal did orally offer Watson the instructor position, Watson's claim nevertheless fails. Watson relies on *Perry v. Sindermann,* 408 U.S. 593, 601, 33 L.Ed.2d 570 (1972) for the proposition that property interests can arise from implied contracts or mutually understood informal procedures. Again, we do not dispute this well-established doctrine.  But this court has long held that, "when formal rules and informal understandings conflict, the formal rules control.  In other words, when the state provides an explicit and formal policy governing entitlement to a job, informal and customary understandings cannot create a property interest in the face of the formal rules." . . .  Watson's reliance on an implied contract or an understood school policy is misplaced because Mississippi has codified detailed procedures for hiring teachers.

*Watson*, 188 F. App'x at 294, *citing Staheli v. Univ. of Miss.*, 854 F.2d 121, 125 (5th Cir. 1988)

(other citations omitted.)

In this case, plaintiff correctly notes that the school district initially informed him that he had a right to a hearing under Miss. Code. Ann. § 37-9-59, but it later determined that, since he was not a "licensed employee," he was not entitled to such a hearing. And, indeed, § 37-9-59 does provide that "[b]efore being so dismissed or suspended any licensed employee shall be notified of the charges against him and he shall be advised that he is entitled to a public hearing upon said charge." Thus, § 37-9-59 makes it clear that only "licensed employees" are entitled to a hearing before being dismissed, and once again, the record seems clear that plaintiff was not a licensed teacher at the time he was fired. It thus seems clear to this court that, as in *Watson*, the informal promise of a hearing which was given to plaintiff conflicted with the actual language of the statute, and Fifth Circuit precedent makes it clear that the latter provisions are controlling.

To be sure, plaintiff has a very reasonable argument that his re-certification was imminent and that he would have been a fully certified teacher for the 2016-17 school year. This arguably gives him a strong equitable position in this context. At the same time, this court can easily understand why the Fifth Circuit in *Watson* and *Staheli* chose not to go down the path of balancing the equities in this context. The determination of whether an individual had a "property" interest in his job is determined by reference to a particular state's law, and property rights are, by their very nature, often technical and harsh in their application. That being the case, it would be a slippery slope indeed if federal courts were to undertake a more subjective inquiry regarding "who was at fault" for the fact that certain state requirements applicable to a particular property interest were not met. While such subjective standards might arguably allow courts to fashion "fairer" results in a particular case, they would detract greatly from the predictability of the law and leave parties in greater uncertainty regarding what their obligations

in a particular context were. In this case, this court simply concludes that, regardless of fault, plaintiff was not a licensed teacher at the time he was terminated, and this resolves the question of whether he had a property interest in his job at the time he was fired.

This court notes that plaintiff has also asserted state law claims in this context, in which he alleges that the school district breached both his employment contract and the requirements of Mississippi statutes in firing him without a hearing. The above-stated conclusions require that these claims be dismissed, since plaintiff's contract was, once again, conditional upon renewal of his teaching license, and he was clearly informed that obtaining such a license was his "personal responsibility." Plaintiff argues that his taking of the certification exam sufficed to meet his responsibility in this regard, but this argument is belied by the fact that his re-hiring was, once again, conditional upon renewal of his license, not upon his taking the test. The simple fact of the matter is that, at the time he was fired, plaintiff's license had not been renewed, and he is unable to reasonably dispute this fact. Moreover, Mississippi statutes make clear that only licensed employees are entitled to a disciplinary hearing as a matter of state law, and this clearly defeats plaintiff's claims alleging a violation of these statutes.[5] Plaintiff's state law claims in this context will therefore be dismissed as well.

**Liberty interest claim**

While this court thus concludes that the school district properly determined that it did not have to offer plaintiff a hearing based upon his property interest in his job and/or based upon

---

[5] Plaintiff also contends that he is allowed to recover under Mississippi statutes requiring that notice be provided regarding the non-renewal of teaching contracts, but defendant correctly argues that these statutes are inapplicable in a case involving dismissal upon a finding of misconduct. *See, e.g. Rivers v. Bd. of Trustees, FCAHS*, 876 So. 2d 1043, 1047 (Miss. Ct. App. 2004)("[T]his case is not a non-renewal case but is in fact a dismissal.").

state law, it appears that it may have overlooked the possibility that he had a Fourteenth Amendment *liberty* interest in maintaining his professional reputation which required a "name clearing" hearing. Indeed, defendant appears to have overlooked this claim in its summary judgment brief as well, since it made no arguments seeking dismissal of any liberty interest claim in its initial brief. Plaintiff clearly alleged such a claim in his second amended complaint, alleging that:

> Plaintiff had a Fourteenth Amendment property interest in his employment, and had a Fourteenth Amendment liberty right to clear his good name. It was widely disseminated that Plaintiff was terminated because he had published nude pictures. Defendant School District never clarified that Plaintiff had nothing to do with the publication of the nude pictures, and that the publication was the result of the vindictive actions of Defendant Keck and/or Defendant Turnage. Defendant School District, thus, denied Plaintiff both liberty and property without due process of law.

[Second amended complaint at 5]. As with plaintiff's retaliation claim, defendant addresses this liberty interest claim for the first time in its reply brief, which clearly seems improper. Of course, plaintiff is always free to seek leave to file a sur-rebuttal brief, but this court can discern no good reason why a claim which is clearly set forth in the complaint cannot be addressed in an initial summary judgment brief. Arguably, this fact alone supports allowing this claim to go to trial.

Out of an abundance of caution, however, this court will address plaintiff's liberty interest claim on its merits, to the extent it can do so based on the available briefing. It is, in this court's experience, relatively uncommon for an employee's firing to implicate his liberty interest under the Fourteenth Amendment, but it appears that this may well be such an unusual case. In its reply brief, defendant concedes that "[t]he Supreme Court has written that 'where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.'" [Reply brief at 13, citing *Wisconsin* v.

16

*Constantineau*, 400 U.S. 433, 437 (1971).]  Defendant adds, however, that this general principle

has been significantly limited by subsequent decisions, writing that:

> Accordingly, **but first**, as clarified in subsequent precedent, Wallace must
> establish public disclosure by the School District of the reasons for his discharge.
> *See Bishop v. Wood*, 426 U.S. 341, 348 (1976).  Here, the School District did not
> publicly disclose the basis for Wallace's termination.   In *Bishop v. Wood*, a
> policeman was terminated from employment without a hearing.  426 U.S. at 342.
> He was informed that the dismissal was based on a failure to follow orders, poor
> attendance at police training classes, causing low morale, and conduct unsuited to
> an officer.  *Id*.  He brought suit alleging that he was deprived an interest in liberty
> under the Fourteenth Amendment.  *Id*.  Because the communication was not made
> public, the Court held it could not "properly form the basis for a claim that
> petitioner's interest in his 'good name, reputation, honor, or integrity' was thereby
> impaired." *Id*. at 348.  "[I]t would stretch the concept too far" to suggest that a
> person is deprived of "liberty" where there is no public disclosure of the reasons
> for the discharge.  *Id*.

[Reply brief at 13-14 (emphasis in original)].

Defendant made these arguments in its reply brief, and this court therefore has no

responsive arguments from plaintiff to consider.  This court can itself discern two major

weaknesses in the argument, however.  First, defendant correctly quotes *Bishop* as requiring that

the charges against the employee have been "made public."  Defendant then proceeds, however,

to conflate this "made public" requirement with a requirement that the plaintiff prove that the

*school district* made the reasons for his firing public.  It is far from clear to this court that this is

correct.  Indeed, the Fifth Circuit has written that:

> This court employs a seven-element "stigma-plus-infringement" test to determine
> whether § 1983 affords a government employee a remedy for deprivation of
> liberty without notice or an opportunity to clear his name.  The plaintiff must
> show: (1) he was discharged; (2) stigmatizing charges were made against him in
> connection with the discharge; (3) the charges were false; (4) he was not provided
> notice or an opportunity to be heard prior to the discharge; (5) the charges were
> made public; (6) he requested a hearing to clear his name; and (7) the employer
> denied the request.

*Bledsoe v. City of Horn Lake, Miss.*, 449 F.3d 650, 653 (5th Cir. 2006). Thus, the Fifth Circuit in *Bledsoe*, like the Supreme Court in *Bishop*, merely required that the charges in question have been "made public." This certainly appears to make sense, because the basic purpose of a hearing is to allow the employee to clear his good name with regard to false charges against him which have become publicly known, regardless of how that occurred.

That brings this court to a second weakness in defendant's argument, namely the fact that there appears to be overwhelming evidence that the charges against plaintiff were, in fact, made public. Once again, this court has no sur-rebuttal briefing from plaintiff to consider, and it is thus unclear exactly how he will seek to prove his case in this regard at trial. However, this court deems it appropriate to take judicial notice of the fact that a simple internet search for "Matt Wallace Desoto Central" revealed numerous media articles stating that the reason for plaintiff's firing was the nude photos in his Ashley Madison account.[6] Typical of these media reports is one from the Jackson Clarion Ledger newspaper, which reported, in an article dated August 15, 2016, that:

> School district officials announced in a brief statement this morning that [Matt] Wallace's employment with the district has ended. . . . The statement offered no details on the reason for Wallace's abrupt departure, but sources say it stems from a nude photograph of Wallace that appeared on the Ashley Madison dating website. The photo and website profile surfaced and became a topic of conversation in the school and community.[7]

---

[6]These articles are not hearsay in this context, since this court is not considering their content to prove the truth of the matter asserted. That is, this court is not considering the articles to establish that plaintiff was fired because of the nude photographs, but, rather, to demonstrate that any prospective employer who conducted a simple investigation of his past would discover the charges, assuming that employer had not already read about them in the extensive media coverage of his firing. This court has not visited the Ashley Madison internet site.

[7]https://www.clarionledger.com/story/sports/high-school/2016/08/15/matt-wallace-out-desoto-central-football-coach/88763122/

This court found numerous similar articles in a very brief search, and it presumes that plaintiff will have little difficulty at trial establishing that the charges against him were "made public." This court notes parenthetically that, even if the law required plaintiff to establish that the school district had itself made the charges public, a jury might very reasonably conclude that the unnamed "sources" quoted in media articles were, most likely, school district sources. Certainly, it would be exceedingly harsh to require a plaintiff to prove this with direct evidence, since a newspaper reporter is quite unlikely to reveal his or her sources, and any school district employee is unlikely to admit having been such an anonymous source. At the same time, a quite compelling circumstantial case could arguably be made in this regard, given that the most obvious source regarding the reasons for plaintiff's firing would, in fact, be school district sources. Regardless, the above-quoted authority merely requires that the charges have been "made public," and defendant has no good faith argument disputing that this was the case here.

This court notes that, if the Clarion Ledger article and/or other similar media reports are properly authenticated and introduced at trial, defendant might well seek to argue that they were truthful, since a "nude photograph of Wallace" did, indeed, appear[] on the Ashley Madison dating website." Plaintiff would, no doubt, counter that the clear *implication* of the article is that he had himself posted his nude photograph on the website, and, as discussed previously, there is very substantial evidence in the record suggesting that this is not the case. This court also notes that the second result in its internet search, after the above-quoted Clarion-Ledger article, was an August 16, 2016 article on the Hottytoddy.com website which stated that:

> DeSoto Central High School football coach Matthew Wallace is out of a job just a few days before the season begins. The north Mississippi coach posted a nude

photo of himself on the notorious Ashley Madison dating website and was
eventually discovered.[8]

Thus, the "Hotty Toddy" article flatly stated that Wallace posted the nude photograph on Ashley

Madison himself. As discussed previously, even plaintiff's ex-wife Keck testified that she did

not believe that plaintiff had done so, and, indeed, that she believed that her friend and co-worker

Turnage had posted the photo, after accessing it (and plaintiff's Ashley Madison password) on

her smartphone. Regardless, this court concludes that the truth or falsity of any particular news

report, and also that of "how much worse" the posting of a nude photograph on a website

associated with adultery is than simply having an account on such a site, is one which is properly

for a jury.

Importantly, defendant concedes in its brief that "until the nude photograph was

disseminated to the public, the school district intended to renew Plaintiff's contract upon his

obtaining proper licensure from the Mississippi Department of Education." [Summary judgment

brief at 10]. This strikes this court as a significant admission, considering that plaintiff has rather

compelling evidence that he personally had nothing to do with the nude photograph becoming

public, other than allowing Keck to photograph him nude while they were married. The fact that

consenting married adults would photograph each other in a state of nudity does not strike this

court as being "immoral," and plaintiff may therefore have a potentially strong argument that he

was fired for something he did not do. This is particularly true considering that the basic fact

that plaintiff had an Ashley Madison account had already been made public the year before. The

school district clearly did not view that fact as justifying plaintiff's termination, nor did it fire

---

[8]https://hottytoddy.com/2016/08/16/north-mississippi-football-coach-loses-job-after-nude-photo-posted.

another teacher who had similarly been revealed to have an account on the site.  At any rate, regardless of how the jury eventually views these issues, defendant offers no valid reasons as to why plaintiff's liberty interest claim lacks merit as a matter of law, and the motion to dismiss this claim will therefore be denied.

**Title VII Sex Discrimination**

In a Title VII discrimination claim, a plaintiff must first make a *prima facie* case for sex discrimination by showing:

> (1) that he/she belongs to a protected class, (2) that he/she was qualified for the position, (3) that he/she suffered an adverse employment action, and (4) that he/she was replaced with a similarly qualified person who was not a member of the protected class or that similarly situated employees were treated more favorably.

*Grimes v. Wal-Mart Stores Texas, L.L.C.*, 505 F. App'x 376, 379 (5th Cir. 2013).  If a plaintiff succeeds in making a *prima facie* case, the burden shifts to the employer "to articulate a legitimate, nondiscriminatory reason for terminating the plaintiff. Once the employer puts forth a nondiscriminatory reason, the plaintiff must show that the employer's proffered reason is merely pretext for discrimination." *Id*.

Defendant argues that plaintiff has failed to establish fact issues regarding the fourth element of its *prima facie* case, which inquires whether "similarly situated employees were treated more favorably."  It is certainly true that Fifth Circuit precedent in this context may be regarded as stringent.  Establishing disparate treatment requires a showing that other employees were treated differently under "nearly identical" circumstances.  *See Little v. Republic Refining Co*., 924 F.2d 93, 97 (5th Cir. 1991) (*quoting Smith v. Wal-Mart Stores*, 891 F.2d 1177, 1180

(5th Cir.1990)). Where the claimant proffers a fellow employee as a comparator, the claimant must demonstrate that the employment actions "were taken under nearly identical circumstances." *Turner v. Kan. City S. Ry. Co.*, 675 F.3d 887, 895 (5th Cir. 2012). Furthermore, the "employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories." *Id.*

While this court recognizes that the above authority sets the bar rather high for plaintiff in this context, it is also true that, in asserting claims under Title VII, he is able to avail himself of the statute's "mixed motive" option, under which he need only demonstrate that his sex was a motivating factor in his termination. *See* 42 U.S.C. § 2000e-2(m). As this court previously noted in its discussion of the facts, the obvious similarities between the circumstances of the release of the nude photographs involving plaintiff and those involving Rivera, and the very different reaction by the school district to those releases, makes it quite difficult for defendant to contend that no genuine fact issues exist regarding whether plaintiff's sex was at least a motivating factor in his termination. Indeed, this court anticipates that, at trial, plaintiff will seek to portray the school district's response to Rivera's complaint as being responsive and protective, and that he will argue that its response to his own complaint was dismissive and unsympathetic. There is, in fact, evidence in the record supporting such a portrayal, as discussed previously.

In attempting to portray the release of Rivera's photograph as materially different from the release of plaintiff's photograph, defendant writes in its brief that:

> Rivera's photo is described as showing only her buttocks/backside, and as "semi-nude." Rivera's photo was shown to approximately four (4) employees from Turnage's cellphone. Rivera did not have a history of inappropriate conduct, as did Wallace. Wallace's photo was full frontal nudity, exposing his entire male

> anatomy. Wallace's photo was posted on a public, social media website that
> anyone could access.

[Reply brief at 3]. These are arguments which are properly presented to a jury, and they may

well prove to be successful ones. For its part, however, this court is unable to conclude that they

establish defendant's right to dismissal as a matter of law. While a jury may well determine that

there is a substantive difference between a photograph depicting a female's nude backside and

one showing a male's full frontal nudity, this is certainly not an issue upon which this court is

prepared to make a pronouncement as a matter of law. This court is likewise unprepared to hold

as a matter of law that the release of nude photographs of a football coach should somehow be

more concerning to a school district than the release of photos of a teacher such as Rivera. These

are all arguments which are properly addressed to a jury.

    Defendant also argues that plaintiff's alleged history of deficient job performance

distinguishes his case from Rivera's. This is, once again, a jury argument. In so stating, this

court reiterates that the fact that the school district had conditionally agreed in March 2016 to re-

hire plaintiff for another year, subject to his teaching certification being renewed, weakens its

argument that his prior "inappropriate conduct" was the reason for his termination. Moreover,

plaintiff correctly notes that defendant failed to make any written reprimands regarding many of

the incidents which, defendant now asserts, partially motivated his firing. In sum, this court

concludes that genuine issues of material fact exist regarding plaintiff's Title VII sex

discrimination claims, and defendant's motion for summary judgment will therefore be denied.

    This court now turns to defendant's motion to dismiss plaintiff's Fourteenth Amendment

Equal Protection claim, which plaintiff has failed to contest. In discussing the law applicable to

this cause of action, defendant writes in its brief that:

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Fifth Circuit indeed recognizes the existence of an equal protection gender discrimination claim. *Saddler v. Quitman County Sch. Dist.*, 2007 U.S. Dist. LEXIS 56844, *12 (N.D. Miss. Aug. 3, 2007) (citing *Southard v. Texas Bd. of Criminal Justice,* 114 F.3d 539, 550 (5th Cir. 1997)). However, the *prima facie* test for a gender discrimination claim under § 1983 is the same as Title VII. *Id.* (citing *Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1047 (5th Cir. 1996)). To demonstrate an equal protection claim, a plaintiff must provide evidence that a state actor intentionally discriminated against him because of membership in a protected class or that he has been intentionally treated differently from others similarly situated, and there is no rational basis for the disparate treatment. *See Nasti v. CIBA Specialty Chems. Corp.*, 492 F.3d 589, 593 (5th Cir. 2007).

Plaintiff fails to establish a claim under the Equal Protection Clause. Quite simply, he is not a member of a protected class – he is a white male. *See Stafford v. City of West Poin*t, 2012 U.S. Dist. LEXIS 44631, *14 (N.D. Miss. 2012); *see also Burnett v. Pearl River Basin Narcotics Task Force*, 2011 U.S. Dist. LEXIS 104225, *24 (S.D. Miss. 2011) (holding that a white male was not a member of a protected class in application of the Equal Protection Clause).

[Summary judgment brief at 19].

Thus, defendant argues that the fact that plaintiff is a white male, and thus not a member of a protected class, defeats his claims. Importantly, plaintiff did not respond to defendant's arguments in this regard in his summary judgment brief, and this court can only regard these arguments as conceded. Indeed, considering that Title VII offers the more forgiving mixed-motive option, plaintiff appears to have decided that it makes sense to pursue his sex discrimination claims only under Title VII. This may well have been a wise decision. In so stating, this court notes that proceeding under both Title VII and Equal Protection *against the same defendant* for the same alleged acts of discrimination would raise potentially thorny issues which might cast doubt upon any jury verdict plaintiff was able to obtain.[9] Even assuming that

---

[9]This court notes that Equal Protection claims are frequently asserted alongside Title VII claims, as a means of imposing liability for discrimination against individuals, rather than employers. This is because individual employees are not subject to liability under Title VII, but they are

plaintiff did not intend to concede his Equal Protection claim, he has failed to oppose defendant's motion to dismiss it, and that motion will therefore be granted.

**Title VII Retaliation**

This court now turns to plaintiff's claim that defendant terminated him because he had opposed the workplace sexual harassment to which, he claims, he was subjected by Keck, in the form of her publicly releasing a nude photograph of him. Defendant did not seek dismissal of this claim in its initial summary judgment brief, and plaintiff argues that this alone requires that this claim proceed to trial. Defendant did argue the issue in its reply brief, and while this court regards this as being too late, it will nevertheless address the merits of defendant's argument, out of an abundance of caution.

In its reply brief, the school district does not dispute that plaintiff made a claim of sexual harassment against Keck, nor does it dispute that this report fell within the scope of the "opposition" clause of Title VII's retaliation provision, which the U.S. Supreme Court has interpreted quite broadly in favor of recovery. *See, e.g. Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn.,* 555 U.S. 271, 279, 172 L. Ed. 2d 650 (2009). In seeking summary

---

potentially subject to liability under an Equal Protection claim asserted pursuant to § 1983. Thus, an Equal Protection claim against an individual defendant can frequently be a useful adjunct to a Title VII action against the employer. In this case, however, plaintiff seeks recovery against the *same defendant* - the school district - under both Title VII and § 1983, for the same alleged acts of sex discrimination. This raises concerns about double recovery, at least in this court's mind. For example, should plaintiff be allowed to obtain mental anguish damages based on the sex discrimination he allegedly suffered, under both Title VII and § 1983? This court frankly does not know the answer to this question, but it does appear to muddy the legal waters in this context and might well cast doubt upon any eventual jury verdict.

judgment as to this claim, the school district instead relies upon an argument that no genuine issues of material fact exist regarding whether retaliation actually motivated the decision to fire plaintiff. In considering this issue, this court notes that the "mixed motive" option is not available to plaintiff in the Title VII *retaliation* (as opposed to discrimination) context, and he must therefore prove that retaliation was a "but for" cause of his termination. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360, 186 L. Ed. 2d 503 (2013).

This court harbors considerable doubt regarding whether a jury will conclude that retaliation for making the report of sexual harassment against Keck was, in fact, the "but for" cause of plaintiff's termination. To the contrary, it seems considerably more likely that a jury will react with understanding to the school district's position that it would rather not have a head football coach who was publicly known to have had a nude photograph of himself posted on his Ashley Madison account. At the same time, if this court were to dismiss this claim on summary judgment based upon this conclusion, then it would be have to overlook some at least potentially valid factual arguments which plaintiff is able to make in this regard.

First, plaintiff notes that his termination occurred mere days after he had reported Keck's sexual harassment against him, and this provides him with a quite strong temporal proximity argument that retaliation motivated his firing. Moreover, this court has previously noted weaknesses in the school district's argument that plaintiff's firing was the culmination of events which had occurred throughout his tenure at Desoto Central. Once again, these weaknesses include the fact that the school district had conditionally agreed to rehire plaintiff in March, 2016, as well as the fact that it had failed to document in writing many of the alleged deficiencies in his work performance upon which it now relies. A jury might also conclude that differences in the manner in which the school district reacted to the report of harassment by the female

teacher Rivera and the one made by plaintiff suggests that it may have been hostile to the notion

that a male teacher would make a report of sexual harassment against a female teacher. This

conclusion might rationally lead a jury to lend credence to either plaintiff's sexual discrimination

claim or to his retaliation claim.

Once again, this court does not deem it *likely* that a jury will make the above factual

inferences in plaintiff's favor, but it is not permitted, at the summary judgment stage, to overlook

the potentially valid factual arguments which he is able to make. Considering the facts in the

light most favorable to plaintiff, this court concludes that genuine issues of material fact exist

regarding plaintiff's Title VII retaliation claim, and defendant's motion to dismiss that claim will

therefore be denied.


### Plaintiff's *McArn* Claims


Plaintiff has also asserted a *McArn* claim under Mississippi state law, alleging that he was

fired for reporting illegal activity by Keck and Turnage in obtaining and releasing his nude

photograph. In 1993, the Mississippi Supreme Court held in *McArn v. Allied Bruce-Terminix*

*Co., Inc*., 626 So.2d 603 (Miss. 1993) that:

> We are of the opinion that there should be in at least two circumstances, a narrow
> public policy exception to the employment at will doctrine and this should be so
> whether there is a written contract or not: (1) an employee who refuses to
> participate in an illegal act as in *Laws* shall not be barred by the common law rule
> of employment at will from bringing an action in tort for damages against his
> employer; (2) an employee who is discharged for reporting illegal acts of his
> employer to the employer or anyone else is not barred by the employment at will
> doctrine from bringing action in tort for damages against his employer.

*McArn*, 626 So.2d at 607.

The school district did not seek dismissal of this claim in its original summary judgment brief, addressing the issue for the first time in its reply brief. For this reason, this court will allow this claim to nominally go to trial, but it acknowledges that it seems highly likely to be dismissed on directed verdict, since defendant appears to be correct that *McArn* applies only to reports of illegal activities by the *employer*. In this case, plaintiff reported allegedly unlawful conduct by his *co-workers*, and, unless he is able to offer this court authority supporting liability in this context, then his *McArn* claim will almost certainly be dismissed on directed verdict. Indeed, this court believes that plaintiff should seriously consider withdrawing the claim himself, if he lacks authority to support it.

In light of the foregoing, it is ordered that defendant Desoto County School District's motion for summary judgment is granted in part and denied in part, as more specifically set forth in this order.

So ordered, this the 21st day of March, 2018.

/s/ Michael P. Mills
U.S. DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI